UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAEVON MARKELL TURNER,<br><br>                            Plaintiff,<br><br>     v.<br><br>CUS BUTLER, *et al*.,<br><br>                            Defendants. | Case No. C21-5070-TSZ-MLP<br><br>REPORT AND RECOMMENDATION |

## I.   INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Daevon Turner filed this action while he was confined at the Washington Corrections Center ("WCC") in Shelton, Washington.[1] Plaintiff asserts in this action that his Eighth Amendment rights were violated when he was transferred to the quarantine unit at the WCC, after refusing to take a COVID-19 test, where he was denied humane conditions of confinement. (Am. Compl. (dkt. # 15) at 4-11.) Plaintiff identifies WCC Custody Unit Supervisor ("CUS") Butler and WCC

---

[1] A review of the Washington Department of Corrections ("DOC") website reveals that Plaintiff is apparently no longer in DOC custody. *See* https://www.doc.wa.gov/information/inmate-search (last visited February 8, 2022).

REPORT AND RECOMMENDATION - 1

Corrections Officer ("CO") County as Defendants in this action.[2] (*Id*. at 1, 3.) Plaintiff seeks monetary relief. (*Id*. at 13.)

Defendants now move for summary judgment. (Defs.' Mot. (dkt. # 36).) Defendants submitted in support of their motion the declarations of Norman Goodenough, Health Services Manager at WCC at times relevant to this action (Goodenough Decl. (dkt. # 37)), and Carol Smith, DOC Resolution Program Manager (Smith Decl. (dkt. #38)). Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (*see* dkt. # 39) but has filed no response to Defendants' motion. The Court, having reviewed Plaintiff's amended complaint, Defendants' motion for summary judgment, and the balance of the record, concludes that Defendants' motion should be granted, and that Plaintiff's complaint and this action should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Allegations/Facts Pertaining to CUS Butler

Plaintiff alleges in Count I of his amended complaint that on January 6, 2021, while he was confined at WCC, medical staff came to his housing unit, R2, "for another round of COVID testing." (Am. Compl. at 4.) Plaintiff asked CUS Butler if the testing was mandatory and CUS Butler responded that it was not. (*Id*.) Plaintiff then told CUS Butler he was refusing the test and CUS Butler, in turn, advised Plaintiff that he would have to treat the refusal as a positive test and move Plaintiff to unit R5 which was being used to house individuals on quarantine. (*Id*. at 5.) Plaintiff asserts that he asked CUS Butler, "if the test isn't mandatory why am I being subject to

---

[2] Defendants, in their summary judgment motion, identify these individuals more specifically as CUS Melvin Butler and CO Hunter County-Ostenson. (Defs.' Mot. at 1, 5.)

REPORT AND RECOMMENDATION - 2

cruel and unusual punishment for refusing?" (*Id*.) Plaintiff claims he had already tested negative seven times at that point. (*Id*.)

Plaintiff asserts that CUS Butler pleaded with him to take the test, and Plaintiff continued to refuse. (Am. Compl. at 5.) Plaintiff claims that CUS Butler told him he did not want to send him to R5 and that, as CUS Butler continued to plead with him to take the test, he told CUS Butler: "I have been on the floor in R2 G10 for over 40 days now. If you move me to a bunk[,] I'll take the test." (*Id*. at 6.) Plaintiff also asserts that he inquired about a vacant two-man cell in the R2 unit and asked if he could be moved there, but CUS Butler denied the request, advising that he could not "violate the cohort." (*Id*.) According to Plaintiff, CUS Butler then told him he would let him "think about it for a minute."

Plaintiff asserts that CUS Butler subsequently returned to his cell with another individual who introduced himself as a "negotiator." (Am. Compl. at 6.) This individual purportedly advised Plaintiff that he had been sent by CUS Butler to try to convince him to take the test. (*Id*.) Plaintiff again refused, and he was transferred to R5 later the same day and remained there for several weeks. (*Id*. at 7.) Plaintiff asserts that the conditions in R5 were poor, and he claims that he was unable to get clean linen or cleaning supplies, that the telephones weren't sanitized, and that masks were not required when COVID-positive inmates came out of their cells. (*Id*.) Plaintiff maintains that CUS Butler was "fully aware" of how poor the conditions were in R5 and that he "acted with a sufficiently culpable state of mind when he made the decision to disregard the risk involed [sic] in punishing me to R5." (*Id*. at 8.) Plaintiff questions why CUS Butler would force him to live in uninhabitable conditions when COVID-19 testing wasn't mandatory, and he claims this constituted cruel and unusual punishment. (*Id*.)

REPORT AND RECOMMENDATION - 3

According to Defendants, at the time Plaintiff arrived at WCC on November 24, 2020, WCC was managing a significant COVID-19 outbreak that lasted through March 2021. (*See* Goodenough Decl. at ¶¶ 4, 7.) During this period, positive cases were found in multiple housing units which resulted in quarantines, restricted movement orders, and limitations on common areas and other places where prisoners might congregate. (*Id*. at ¶ 4.) As a result of mitigation strategies employed to prevent the spread of COVID-19, there was an increased amount of movement of prisoners between housing units during this period as well. (*Id*. at ¶ 5.) The increased movement was necessary to adjust to the changing needs of the population, provide the best medical care to inmates who were ill, and keep healthy inmates healthy. (*Id*.)

Unit R5 was designated as the medical quarantine unit because the air handling system within the unit limited the amount of air shared outside of each cell. (Goodenough Decl. at ¶ 5.) Because of the number of prisoners requiring placement on quarantine, WCC ran out of bed space which resulted in some prisoners who were not on quarantine having to be housed temporarily as floor sleepers, and also in the gymnasium and the chapel. (*Id*. at ¶ 6.)

During the period referenced above, WCC prisoners who refused a COVID-19 test were placed in quarantine. (Goodenough Decl. at ¶ 8.) WCC prison administration, in deciding on this course of action, was guided by conversations with the DOC's medical clinical leadership about how such situations should be addressed. (*See id*. at ¶¶ 8-9.) Prisoners who refused to be tested for COVID-19 were moved to quarantine in order to limit the risk of spreading the virus from individuals who refused to be tested, and thus, had an unknown infection status, to individuals who agreed to be tested and had tested negative. (*See id*. at ¶10.)

REPORT AND RECOMMENDATION - 4

**B.     Allegations/Facts Pertaining to CO County-Ostenson**

Plaintiff alleges in Count II of his amended complaint that, on the evening of January 18, 2021, while confined in R5, he woke up needing to use the restroom and noticed that the toilet in his cell was clogged. (Am. Compl. at 9.) Plaintiff claims he waited for CO County-Ostenson to walk through the unit and then asked him for a plunger. (*Id*.) CO County-Ostenson apparently brought Plaintiff a plunger, and Plaintiff plunged the toilet, but it overflowed onto the floor. (*Id*.) When CO County-Ostenson passed Plaintiff's door later that evening while conducting the evening "head count," Plaintiff showed him what had happened. (*Id*.) According to Plaintiff, CO County-Ostenson indicated he would bring towels to allow Plaintiff to clean up the floor after he finished conducting the count, but he never did so. (*Id*. at 9-11.) Plaintiff asserts that he was forced to remain in these hazardous conditions, with no way to relieve himself, throughout the night and he claims that CO County-Ostenson's failure to take action demonstrated a reckless disregard for his health and safety. (*Id*. at 10-11.)

### III.     DISCUSSION

**A.     Applicable Legal Standards**

*1.     Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by

REPORT AND RECOMMENDATION - 5

producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."

REPORT AND RECOMMENDATION - 6

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

    2.    Section 1983 Standard

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show: (1) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

**B.**    **Analysis**

    1.    Count I: CUS Butler

Plaintiff asserts that CUS Butler violated his Eighth Amendment rights when CUS Butler made the decision to transfer Plaintiff to the quarantine unit after he refused to take a COVID-19 test, despite CUS Butler's awareness of how poor the conditions were in that unit. (Am. Compl. at 8.) The treatment a prisoner receives in prison, and the conditions under which he is confined, are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. *Id*. This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component. The Eighth Amendment standard requires proof that: (1) the alleged

REPORT AND RECOMMENDATION - 7

wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the prison official acted with a sufficiently culpable state of mind. *Id*. at 834.

The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference" standard, a prison official cannot be found liable for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. *Id*. at 837.

Defendants argue that CUS Butler's action did not constitute deliberate indifference. (*See* Defs.' Mot. at 10-11.) This Court concurs. The record before the Court demonstrates that any risk Plaintiff was exposed to as a result of his transfer to the quarantine unit was a risk that he consciously assumed. By Plaintiff's own admission, CUS Butler clearly explained to him the consequences of refusing to take a COVID-19 test, made clear to him that the conditions in the quarantine unit were more restrictive, pleaded with him to take the test, and even brought in another individual to attempt to convince him to take the necessary test to avoid transfer to the quarantine unit. (Am. Compl. at 5-6.) Despite these efforts, Plaintiff adamantly refused to be subjected to another COVID test and, as a result, left CUS Butler no option but to transfer him in accordance with DOC and WCC COVID-19 protocols. (*Id*. at 6; Goodenough Decl. ¶¶ 8-10.)

Plaintiff appears to suggest in his amended complaint that CUS Butler had some option available to him under the circumstances other than transferring Plaintiff to the quarantine unit, but Plaintiff offers no evidence to support this suggestion. Moreover, while Plaintiff claims that

REPORT AND RECOMMENDATION - 8

the conditions in the quarantine unit were uninhabitable, he offers only bare allegations suggesting that the conditions there were less desirable than those in the unit he had been transferred from, and no actual evidence that the conditions in the quarantine unit created an excessive risk to his health or safety. Plaintiff has not established any violation of his Eighth Amendment rights arising out of the actions of CUS Burton on January 6, 2021, and thus, Defendants are entitled to summary judgment with respect to the first count of Plaintiff's amended complaint.[3]

### 2. Count II: CO County-Ostenson

Plaintiff asserts that CO County-Ostenson violated his Eighth Amendment rights when he failed to provide Plaintiff with towels and cleaning supplies to clean his cell after his toilet overflowed, which resulted in Plaintiff being exposed to hazardous living conditions for several hours. (Am. Compl. at 9-11.) Defendants argue that Plaintiff failed to exhaust his administrative remedies with regard to his claims against CO County-Ostenson. (Defs.' Mot. at 15-16.)

The Prison Litigation Reform Act of 1996 provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) requires *complete* exhaustion through any available process. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Booth v. Churner*, 532 U.S. 731, 735 (2001). Section 1997e(a) also requires *proper* exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper" exhaustion means full

---

[3] Defendants offer a number of additional arguments in support of their request for summary judgment with respect to Plaintiff's claim against CUS Butler. However, the Court need not address those arguments given its conclusion that Plaintiff has not established any violation of his Eighth Amendment rights.

REPORT AND RECOMMENDATION - 9

compliance by a prisoner with all procedural requirements of an institution's grievance process. *See id.* at 93-95.

Failure to exhaust administrative remedies is an affirmative defense which a defendant must plead and prove. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). A defendant must produce evidence demonstrating that there was an available administrative remedy and that the prisoner did not exhaust that remedy. *Id.* at 1172. The burden then shifts to the prisoner who must show that there is something in his case that made the existing remedies effectively unavailable to him. *Id.* If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment. *Id.* at 1166.

Defendants, in conjunction with their summary judgment motion, have produced evidence demonstrating that the DOC has an established grievance/resolution program through which prisoners may file resolution requests relating to various aspects of their incarceration.[4] (Smith Decl. at ¶ 3.) Among the issues a prisoner may grieve are: (1) DOC policies, rules, and procedures; (2) the application of such policies, rules, and procedures; (3) the lack of policies, rules, or procedures that directly affect the living conditions of the offender; (4) the actions of staff and volunteers; (5) the actions of other offenders; (6) retaliation by staff for filing grievances; (7) personal safety; and (8) physical plant conditions. (*See id.* at ¶ 4; dkt. # 38-1 at 10.)

Prisoners have twenty working days from the date of an incident to file a resolution request, and the grievance/resolution procedure has four levels of review. (Smith Decl. at ¶¶ 6,

---

[4] This program is now known as the "Resolution Program," but prior to March 2021 it was known as the "Offender Grievance Program." (Smith Decl. at ¶ 3.)

REPORT AND RECOMMENDATION - 10

8.) The initial level, Level 0, is the informal resolution stage. (*Id*.) At this level, the Resolution Specialist at the prison receives a written complaint from a prisoner which identifies an issue with respect to which the prisoner wishes to pursue a resolution. (*Id*.) The Resolution Specialist either pursues informal resolution, returns the complaint to the prisoner for rewriting or for additional information, or accepts the complaint and processes it as a concern that warrants Level I review. (*Id*.)

At the first step of the formal resolution process, Level I, a prisoner's resolution request is reviewed and responded to by the institution's Resolution Specialist. (*See* Smith Decl. at ¶ 6.) A prisoner who is dissatisfied with the response received from the Resolution Specialist may appeal that decision. (*Id*.) The appeal is assigned to an employee or contract staff for review and the Superintendent or Health Services Administrator issues a formal response. (*Id*.) This is known as Level II. (*Id*.) An offender who is dissatisfied with the Level II response may appeal that decision to DOC headquarters where the appeal is reviewed, and a formal response is issued by the Deputy Secretary or his/her designee. (*Id*.) This is known as Level III and is the final level of review. (*See id*.)

According to DOC records, Plaintiff filed a total of 20 grievances during the time he was confined at WCC from November 24, 2020, to May 17, 2021. (Smith Decl. at ¶ 10.) DOC Resolution Program Manager Smith reviewed those 20 grievances and found that none of them pertain to the allegations made against CO County-Ostenson in Plaintiff's amended complaint. (*Id*. at ¶ 11.) She further found that none of the reviewed grievances pertain to anything Plaintiff alleges occurred on January 18, 2021, or January 19, 2021, relating to the clogged toilet, the plunger, or sewage overflowing onto the cell floor and remaining there for a number of hours. (*Id*.) Plaintiff offers no evidence to the contrary, and this Court's review of Plaintiff's grievances

REPORT AND RECOMMENDATION - 11

confirms that none of the grievances submitted by Plaintiff while he was at WCC pertain in any way to the allegations made against CO County-Ostenson in this action. (*See* dkt. ## 40, 40-1.)

As the record makes clear that Plaintiff made no attempt to pursue his administrative remedies through the DOC's established grievance process with respect to the claim asserted in the second count of his amended complaint, Plaintiff failed to properly exhaust his available administrative remedies as required by 42 U.S.C. § 1997e(a). Defendants are therefore entitled to summary judgment with respect to that claim.[5]

### IV.   CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment be granted, and that Plaintiff's amended complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

//
//
//
//
//
//
//
//
//

---

[5] Defendants offer a number of additional arguments in support of their request for summary judgment with respect to Plaintiff's claim against CO County-Ostenson as well. However, the Court need not address those arguments given its conclusion that Plaintiff failed to exhaust his administrative remedies.

REPORT AND RECOMMENDATION - 12

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **March 4, 2022**.

DATED this 9th day of February, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 13